No. 79SA407

Rosalie Lovato, a/k/a Rosalie Trujillo and Laurence A. Ardell and Mickey W. Smith, as Guardians Ad Litem of Jerry Trujillo v. The District Court in and for the Tenth Judicial District, State of Colorado and the Honorable Donald E. Abram, one of the District Judges in and for the Tenth Judicial District, State of Colorado, Parkview Episcopal Hospital, Thomas K. Reichert, M.D., Jerry (NMI) Trujillo, Lawrence Nash Baros and the Pueblo County Department of Social Services

(601 P.2d 1072)

Decided October 15, 1979.

420

Carl W. Gellenthien, for petitioner, Rosalie Lovato, a/k/a Rosalie Trujillo.

Laurence A. Ardell, Guardian Ad Litem, Mickey W. Smith, Guardian Ad Litem, petitioners Pro Se.

Peterson & Fonda, Thomas T. Farley, for respondent, Parkview Episcopal Hospital.

Stephen A. Reed, Assistant County Attorney, for respondent Pueblo County Department of Social Services.

No appearance for other respondents.

*En Banc.*

JUSTICE GROVES delivered the opinion of the Court.

This is an original proceeding to review the order of the respondent district court directing the guardians ad litem of a child to execute a document authorizing the treating physician of the child and the hospital involved to remove all life support devices if in the doctor's opinion the child was legally dead, as defined by the court. The court stayed execution of its order for 10 days in order to permit review of the decision. We issued a rule to show cause and a stay of execution of the order. Later, we discharged the rule and stay, with opinion to follow. This is the opinion.

One of the petitioners, Rosalie Lovato, is the mother of Jerry Trujillo, who was 17 months old on August 14, 1979. At 6:00 a.m. on August 23, 1979 Jerry was discovered at his mother's apartment in Pueblo, Colorado, gagging, spitting up mucous, having difficulty breathing and unresponsive. He was taken to the respondent Parkview Episcopal Hospital. The child had been grossly abused and was not breathing. He had a faint pulse. A mechanical respirator was applied.

On August 23rd the mother was arrested for alleged abuse of the child and the Pueblo County Department of Social Services (Social Services) conducted a preliminary investigation of the family situation. The investigation resulted in the filing by Social Services in the respondent court of a report and a request for an order allowing the filing of a petition in

dependency or neglect, for temporary custody, protective orders and the appointment of a guardian ad litem for Jerry.[1]

A shelter hearing pursuant to section 19-2-101, *et seq.*, C.R.S. 1973 (now in 1978 Repl. Vol. 8), was initiated on August 24th to determine the type of temporary care necessary for the child. Both Jerry's parents appeared and were advised of their legal rights in connection with the hearing. It there appeared that the respondent Jerry (NMI) Trujillo, the father of the child, had lost all parental rights. Because the mother indicated that she desired to be represented by counsel, counsel was appointed for her and the shelter hearing was continued until August 29th.

At the shelter hearing on August 29, the court placed temporary custody of the child with Social Services, permitted it to file a petition in dependency or neglect, and appointed petitioners Ardell and Smith as guardians ad litem for the child. Social Services filed a motion requesting a hearing to determine whether the child should be maintained on the mechanical respirator, and the court set the motion for hearing on September 4th. On August 31st the court appointed an independent neurologist to examine the child and to testify regarding his condition.

On September 4th the child's attending physician (the respondent Reichert), his consulting neurologist and the court-appointed neurologist testified. Their testimony detailed the child's medical condition and supported the conclusion of each that prior to the date of the hearing the child had suffered total brain death caused by extensive brain damage resulting from head trauma.

Their clinical examinations of the child revealed the following: he had sustained multiple bruises, was completely comatose, was not breathing spontaneously, and his respiration was maintained entirely by artificial means. His heart was beating and his blood pressure was approximately 60/40. He had no spontaneous muscular movements, no reflexes, including stretch of tendon reflexes, and no response to even the most intense pain or other stimuli. Corneal reflexes were absent. His pupils were dilated and fixed, showing no response to light. There were no signs of involuntary physical activity such as swallowing, blinking, yawning and pharyngeal reflexes. Electroencephalogram (EEG) tests were given on August 24th, 27th and 31st. Each showed a complete lack of brain function.

The doctors testified that, while clinical and laboratory criteria used to diagnose brain death are less certain with respect to young children than to older persons, nevertheless more than sufficient time had elapsed to allow a definitive and accurate diagnosis of total and irreversible cessation of brain function.

---

[1] The proceedings also involved two other children of the mother.

The experts' prognoses were: that the child's physiological condition would deteriorate rapidly; that his vital functions, which were being maintained by the respirator, would nevertheless deteriorate and ultimately cease; that, even if the child were maintained on the respirator, cardiac arrest would occur within a month or so; and that he would never regain a cognitive state nor ever have spontaneous respiration. Their recommendation to the court was that the respirator and any other artificial mechanisms supporting the vital functions of the child's body be discontinued since the child had suffered brain death.

In the order of September 4th, the trial court found, based on the uncontradicted medical testimony, that: (1) the child had sustained cerebral death as evidenced by total lack of brain activity in both the cortex and the brain stem and by complete absence of both behavioral response and response to stimuli in any manner; (2) the cerebral death was irreversible; and (3) nothing, including maintenance of the child on the respirator, could be done to re-establish spontaneous brain function or respiration.

The court found that each of Jerry's parents was unable and not available to act as a parent. It determined that it had the statutory right to take jurisdiction over such a matter in the shelter hearing and to issue orders for the protection, support or medical treatment of the child.

Following these findings of fact, the court identified the major issue before it as the definition of death in Colorado. It concluded that the legal definition of death in Colorado is that state which occurs when it is determined by a physician, based on reasonable medical standards, that there is no spontaneous brain function and either spontaneous respiratory function or spontaneous circulatory function cannot be restored by resuscitation or supportive maintenance.

The court ordered the guardians ad litem of Jerry to execute a document authorizing the treating physician and Parkview Hospital to remove all extraordinary devices, such as the respirator, if in the doctor's opinion the legal standard of cerebral death set forth by the court had been met. As mentioned, the court stayed execution of its order to provide time for this court to act.

I.

The mother claims that the respondent court, acting as a juvenile court, exceeded its jurisdiction and abused its discretion when it ordered discontinuance of life support systems and resuscitative efforts. To support that claim she advances several contentions, which may be summarized as follows: First, the order terminated the parent-child legal relationship in violation of state and federal constitutional provisions guaranteeing her right to privacy and due process and prohibiting cruel and unusual punishment, and in violation of sections 19-1-106 and 19-3-111, and 113, C.R.S. 1973 in the Children's Code. Second, the court order defining and applying the definition of brain death in these circumstances invaded the

providence of the legislature and contravened Colorado's adoption of the common law pursuant to section 2-4-211, C.R.S. 1973.

We do not agree with these contentions.

■■■ The juvenile court's September 4th order included a finding that jurisdiction existed under the Children's Code (sections 19-1-101, *et seq.*, C.R.S. 1973). We agree. The General Assembly declared the purpose of the Children's Code to be, *inter alia,* to secure for each child such care as will best serve his welfare and the interests of society and to remove a child from the custody of his parents only when his welfare and safety would otherwise be endangered. Section 19-1-102, C.R.S. 1973. Furthermore, the General Assembly gave to the juvenile court exclusive jurisdiction over any child in need of supervision or who is neglected or dependent, to determine the legal custody of a child, to appoint a guardian or custodian of such a child, and to issue temporary orders providing for medical or surgical treatment as the court deems is in the best interests of a child under its jurisdiction. Section 19-1-104, C.R.S. 1973.

We believe the facts of this case exemplify a set of circumstances contemplated by the General Assembly when it enacted the Children's Code and provided for juvenile court jurisdiction. We hold, therefore, that the court had jurisdiction and its action was proper.

■ The mother builds much of her argument on the assumption that the court terminated her legal parental relationship with her son. We can find no such order in the record, nor can we find even an implied termination of her parental rights. Under the circumstances here before us, the court properly ordered custody of the child be taken from the mother and given to the Department of Social Services. Contrary to petitioner's allegations we discern no constitutional or statutory violations arising from the court's action.

## II.

The guardians ad litem have joined the mother in claiming that the court exceeded its jurisdiction and abused its discretion when it judicially recognized, for the first time in Colorado, the concept of brain death. They argue that in these circumstances to recognize and to implement judicially the concept of brain death is tantamount to depriving the child of life. We do not share that opinion. We are of the opinion, as were the medical experts and the respondent court, that sometime prior to September 4th the child had joined that innumerable caravan and moved to his chamber in the silent halls of death.

The prime issue before us is the proper definition of death. Petitioners urge that, pursuant to section 2-4-211, C.R.S. 1973 (first adopted by the Colorado Territorial Legislature in 1861),[2] the legal definition of death in

---

[2] R.S. p. 105.

Colorado is that recognized by the common law of England as it existed prior to 1607. They further urge that, because the General Assembly has not yet specifically embraced by statute the concept of brain death, the respondent court's recognition of it is both a misstatement and a misapplication of the law, as well as a usurpation of legislative prerogative.

It is true that section 2-4-211 adopted the common law of England in existence prior to 1607 and provided that it should be "considered as of full force until repealed by legislative authority." However, the Colorado Territorial Legislature and later the General Assembly wisely worded that statute so as to provide that the English common law be adopted only where *applicable* and of a general nature. This court has recognized that the statutory adoption of the common law is limited to the extent that it is reasonable to apply the English common law to the needs and conditions of our state. *Crippen v. White,* 28 Colo. 298, 64 P. 184 (1901). In the event that the common law definition of death did not include brain death in the light of present scientific knowledge, such an exclusion is no longer applicable.

Conceivably, the common law might be interpreted broadly enough to include permanent cessation of brain functions as one of the definitions of death. One of the common law definitions of death was "cessation of life." *Bouvier's Law Dictionary* (Rawle's ed.) p. 775 (1914); *Cyclopedic Law Dictionary,* p. 285 (1922).

We use the assumption here, however, that under the common law a person was considered dead when there was,

"total stoppage of the circulations of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." *Black's Law Dictionary* (4th ed. 1951), p. 488.

To repeat, we hold that this definition is not applicable as precedent under circumstances such as are present in this case.

### III.

As a prelude to the reason for our ruling in this case, we first discuss (1) modern scientific views, (2) judicial decisions, and (3) comparatively recent legislation in other states.

### IV.

Prior to the development of resuscitative technology in recent decades, the medical profession went no further generally than to conclude that "[w]hen a person's heart stopped beating and he stopped breathing, he was dead . . . ."[3] With advances, including resuscitative technology and organ transplants, the medical community has developed a more

---

[3] Wasmuth, Jr., *The Concept of Death,* 30 *Ohio St. L. Rev.* 32 (1969).

complete definition of death. There is a wealth of material describing these advances during the past 10 years. The all but unanimous view endorses the concept of brain death.[4]

Dr. Reichert testified at the September 4th hearing that in his diagnosis of death he relied in part upon criteria espoused in 1968 by the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death.[5] These criteria constitute the basis of accepted medical standards for determination of brain death. The Committee's report stated that its purpose was to define for the first time irreversible coma as a criterion for death,[6] thereby aiding the determination of death particularly of a comotose individual with irreversible injury to the whole brain who is being maintained by resuscitative and supportive measures or of an individual who has sustained brain death and has been identified as an appropriate donor of organs for transplantation.

The Harvard Committee identified three basic criteria to determine the existence of a permanently non-functioning brain. In summary, they are: (1) unreceptivity and unresponsitivity to even the most intensely painful stimuli; (2) no spontaneous movements or spontaneous breathing for at least one hour (this could be established when a person is on a mechanical respirator by turning off the respirator for three minutes and observing whether there was any effort to breathe spontaneously); (3) no reflexes, as shown by no ocular movement, no blinking, no swallowing, and fixed and

---

[4] Conway, *Medical and Legal Views of Death: Confrontation and Reconciliation,* 19 *St. Louis U.L.J.* 172 (1974). In addition to authorities cited elsewhere in this opinion, *see also* Arnet, *The Criteria for Determining Death in Vital Organ Transplants — A Medical-Legal Dilemma,* 380 *Mo. L. Rev.* 220 (1973); Biorck, *When is Death?,* 1968 *Wis. L. Rev.* 484; Black, *Brain Death, Part I,* 299 *N. Eng. J. Med.* 338 (1978); Black, *Brain Death, Part II,* 299 *N. Eng. J. Med.* 393 (1978); Cantor, *Quinlan, Privacy, and the Handling of Incompetent Dying Patients,* 30 *Rutgers L. Rev.* 243 (1977); Collestar, Jr., *Death, Dying and the Law: A Prosecutorial View of the Quinlan Case,* 30 *Rutgers L. Rev.* 304 (1977); Frederick II, *Medical Jurisprudence - Determining the Time of Death of the Heart Transplant Donor,* 51 N.C.L. Rev. 172 (1972); Friloux, Jr., *Death, When Does It Occur?,* 27 *Baylor L. Rev.* 10 (1975); Hirsh, *Brain Death,* 1975 *Med. Trial Tech. Q.* 377; Hoffman and Van Cura, *Death - The Five Brain Criteria,* 1978 *Med. Trial Tech. Q.* 377; Note, *The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State,* 51 *N.Y.U.L. Rev.* 285 (1976).

[5] 205 *J.A.M.A.* 85 (1968).

[6] Apparently the medical community now agrees on the important distinction between irreversible coma and brain death. The former is described as a vegetative state where all cerebrum functions are lost but other vital functions persist, such as heart beat, breathing, and temperature. This condition unfortunately is suffered by more than a few individuals, among whom is Karen Ann Quinlan. *See, In the Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976). While there may be an ongoing debate over whether a person in a persistent vegetative state in certain circumstances should be allowed to rest without artificial means of support, we do not address that issue here as it is not before us and is not relevant to the issue of the definition of death. We are here concerned with brain death, which, in contrast to irreversible coma, is described as the total destruction of the brain such that both volitional and reflex evidences of responsivity are absent. Because brain functioning is present, irreversible coma is not recognized by the medical community as synonomous with death. The term brain death is used to identify the total absence of brain functioning, a condition from which somatic death inevitably follows. *See* 237 *J.A.M.A.* 982 (1977).

dilated pupils. The report recommended a fourth criterion to be used only as a confirming test: flat EEG's taken twice with at least a 24 hour intervening period, using a machine properly functioning and properly applied, coincident with the absence of hypothermia and central nervous system depressants, such as barbiturates.

A year following the Harvard Report the Ad Hoc Committee of the American Electroencephalographic Society on EEG Criteria for the Determination of Cerebral Death published its report[7] urging refinement of, and further education in, the use of the EEG in the determination of death. It recommended that the acceptable EEG criterion be termed "electrocerebral silence," thereby ruling out possible misundertandings and misuse of the criterion which it feared would result from the use of the adjective "flat," or "isoelectric," to describe the EEG. The committee was adamant in stating the belief of EEG experts that the EEG should not ever be used alone to diagnose cerebral death.[8] The report characterized the condition of irreversible cessation of cerebral function as (1) coma with complete unresponsiveness; (2) cessation of spontaneous respiration, no muscle tone, and a flaccid paralysis; (3) absence of all reflexes (including fixed dilated pupils and absence of cephalic reflexes); (4) frequent inability to maintain circulation without artificial means; and (5) a linear EEG, unresponsive to any stimulation.

Three years later the Task Force on Death and Dying of the Institute of Society, Ethics, and the Life Sciences published its appraisal of the criteria for the determination of brain death, especially in persons on artificial support mechanisms where the traditional signs of death are obscured because of the intervention of resuscitation machinery.[9] The report focused on the need for clear and simple, yet multiple and nonexclusive, testing criteria compatable with the continued use of the traditional criteria of cessation of spontaneous heartbeat and respiration. The report concluded that the Harvard criteria were reasonable and appropriate and, as was the case of the earlier report, stressed the Committee's opinion that the EEG should not be accepted as an exclusive, but rather should remain a confirmatory test of death.

More recently in yet another effort made by the medical profession to appraise the criteria of cerebral death,[10] results of a collaborative study of 503 comatose patients who lacked spontaneous respiration were published. The synopsis of that study concluded that the determination of cerebral

---

[7] 209 *J.A.M.A.* 1505 (1969).
[8] Recently, a study has been presented supporting the opinion that the EEG need not be a mandatory part of the process of certification of brain death. 300 *N. Eng. J. Med.* 502 (1979).
[9] *Refinements in Criteria for the Determination of Death: An Appraisal.* 221 *J.A.M.A.* 48 (1972).
[10] *An Appraisal of the Criteria of Cerebral Death, A Summary Statement,* 237 *J.A.M.A.* 982 (1977).

death requires: (1) that all appropriate examinations and therapeutic procedures have been performed; (2) that cerebral unresponsivity, apnea,[11] dilated pupils, absent cephalic reflexes, and electrocerebral silence be present for 30 minutes at least six hours after the ictus;[12] plus the criterion (3) that, if one of these standards is met imprecisely or is incapable of being tested, a confirmatory test be made to demonstrate the absence of cerebral blood flow.

The November 1978 report of the Ad Hoc Brain Death Committee of the Colorado Association of Clinical Neurologists was admitted in evidence. The report contains the following summary of its conclusions:

"We believe brain death is a valid diagnosis, being synonymous with death as diagnosed traditionally by cessation of cardiorespiratory function. The diagnosis is a clinical one, and can be made by any licensed physician. However, in the usual and customary practice of the community, we expect neurological or neurosurgical consultants to be utilized by other physicians whenever possible. The criteria for brain death are: coma, not due to CNS depressant drugs; apnea; and an absence of cortical or brain stem function. Lab tests, such as the EEG or angiogram, are helpful in confirming the diagnosis, but they are neither necessary nor sufficient for this purpose."

## V.

Other courts have preceded us in addressing the question of brain death.[13] In *State v. Shaffer,* 223 Kan. 244, 574 P.2d 205 (1977), the court upheld the constitutionality of the Kansas death statute[14] against the appellant's contrary contentions on the grounds of vagueness in that the statute allowed either of two separate standards to be applied to the single phenomenon of death. This was a murder case in which the defendant had shot the victim in the head. His heart continued to beat. Physicians, having pronounced the victim dead from the brain injury, with his family's consent, removed his kidneys for transplantation donation, and then disconnected a respirator from his body. The court refuted the defendant's argument that the victim's death had been caused by the kidney removal operation by noting that the jury had been instructed as to the possible alternative causes of death, *viz.,* brain death from the gunshot wound or the transplant procedure.

The defendant in *Cranmore v. State,* 85 Wis. 2d 722, 271 N.W.2d 402 (1978), claimed under similar circumstances that the trial court committed reversible error in refusing to instruct the jury on the question of

---

[11] Absence of respiration.
[12] A stroke.
[13] We regard *Sauers v. Stolz,* 121 Colo. 456, 218 P.2d 741 (1950), discussed later in this opinion, as a pre-brain-death era case.
[14] *See* text immediately preceding note 20.

what constitutes death and when it can be said to occur. The court, upholding the defendant's murder conviction, declined to define death. It did, however, recognize that:

"advances in the medical sciences 'can now restore 'life' as judged by the ancient standards of persistent respiration and continuing heartbeat. This can be the case even when there is not the remotest possibility of an individual recovering consciousness following massive brain damage.'"

In *Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978) the defendant was convicted of first-degree murder. His victim had been connected to a respirator upon his immediate admission to the hospital. Two days later he had failed to breathe spontaneously when temporarily disconnected from the respirator, and no cerebral electrical activity had showed on an EEG. The same EEG and respiration results had been obtained after another two days. After consultation with his family after two more days, the respirator was removed from the victim and his heart stopped. Just as petitioners in the instant case, the defendant there contended that the trial judge had changed the law and invaded the province of the legislature when it instructed the jury that "the occurance of a brain death . . . satisfies the essential element of the crime of murder requiring proof beyond a reasonable doubt of the death of the victim." The Massachusetts court rejected those arguments. It stated that the trial judge had taken into account significant technological advances in the area of artificial life support and merely had made an "evolutionary restatement" of the rule rather than a substantively new rule.[15]

## VI.

No statute has been enacted in Colorado relating to brain death in the sense that the subject is addressed in this opinion.[16]

The petitioners argued that the definition of "fetal death" in the Vital Statistics Act[17] indicates an intent on the part of the General Assembly generally to recognize somatic expiration as the only form of death. This statute provides.

"'Fetal death' means death prior to the complete expulsion or extraction from its mother of a product of human conception, irrespective of the duration of pregnancy. The death is indicated by the fact that after such expulsion or extraction the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or

---

[15] The court limited its approval of the concept of brain death to situations where criminal convictions are affected.

[16] In 1979 H.B. 1416 was introduced into and passed by the Colorado House of Representatives. This provided that one of the definitions of death would be irreversible cessation of all funtioning of the brain. The bill did not pass the Senate.

[17] Section 25-2-102(2), C.R.S 1973.

definite movement of voluntary muscles."

We regard this as solely a definition of fetal death, and we do not find it persuasive with respect to death otherwise.

Petitioners further argue that, since there is no definition of death in the Uniform Anatomical Gift Act,[18] there was an intent upon the part of the General Assembly not to change the common law definition of death, which they regard as cessation of circulation of the blood, respiration and pulsation. We are not persuaded by this argument.

Presently 25 states have adopted brain death statutes.[19]

The first state to legislate a recognition of brain death was Kansas. Its statute reads:

"A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation are considered hopeless; and, in this event, death will have occurred at the time these functions ceased; or

"A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous brain function; and if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore spontaneous circulatory or respiratory function in the absence of aforesaid brain function, it appears that further attempts at resuscitation or supportive maintenance will not succeed, death will have occurred at the time when these conditions first coincide. Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.

"These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding."[20]

---

[18] Section 12-34-101, et seq., C.R.S. 1973 (now in 1978 Repl. Vol. 5).

[19] Ala. Act 165, 1979; Alaska Stat. § 09.65.120; Ark. Stat. Ann. § 82-537; Cal. Health & Safety Code § 7180; Conn. Public Act 79-556; Ga. Code § 88-1715.1; Haw. Rev. Stat. § 327 C-1; Idaho Code § 54-1819; Ill. Rev. Stat. ch. 110 1/2, § 302; Iowa Code § 702.8; Kan. Stat. § 77-202; La. Civ. Code Ann. art. 9:111; Md. Ann. Code art. 43, § 54F; Mich. Comp. Laws § 326.8b; Mont. Rev. Codes Ann. § 50-22-101; Nev. Stats. ch. 451 (S.B. No. 5, ch. 162, Sixtieth Sess., 1979); N.M. Stat. Ann. § 1-2-2.2; N.C. Gen. Stat. § 90-322; Okla. Stat. tit. 63 § 1-301; Or. Rev. Stat. § 146.087; Tenn. Code Ann. 53-459; 1979 Tex. Sess. Law Serv., p. 368; Va. Code § 54-325.7; W. Va. Code § 16-19-1; and Wyo. Stat. § 35-19-101.

[20] Ibid. Three other states have adopted similar versions: Maryland, New Mexico and Virginia, Ibid.

Reaction to the Kansas statute included a proposal by Capron and Kass[21] of an alternatively worded statute, which has been adopted by eight states,[22] and which reads:

"A person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice, he has experienced an irreversible cessation of spontaneous respiratory and circulatory functions. In the event that artificial means of support preclude a determination that these functions have ceased, a person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice, he has experienced an irreversible cessation of spontaneous brain functions. Death will have occurred at the time when the relevant functions ceased."

As can be seen, the Capron and Kass version differs from the Kansas model in that the former recognizes brain death only when traditionally defined somatic death cannot be determined because the person's respiration and circulation are being artificially supported.

■ The American Bar Association approved in 1975 the following model, which has subsequently been adopted in two states:[23]

"For all legal purposes, a human body with irreversible cessation of total brain functions, according to the usual and customary standards of medical practice, shall be considered dead." 61 A.B.A.J. 464 (1975).

The Board of Trustees of the American Medical Association in January 1979 approved a model bill which reads:

"A physician, in the exercise of his professional judgment, may declare an individual dead in accordance with accepted medical standards. Such declaration may be based solely on an irreversible cessation of brain function."

So far as we are advised, the Uniform Brain Death Act, approved in 1978, has been adopted to date only by Nevada.[24] It states:

"For legal and medical purposes, an individual who has sustained irreversible cessation of all functioning of the brain, including the brain stem, is dead. A determination under this section must be made in accordance with reasonable medical standards." 1979 Supp. to 12 Uniform Laws Annot. p.10.

## VII.

■ At this juncture we discuss *Sauers v. Stolz,*121 Colo. 456, 218 P.2d 741 (1950). There this court held inapplicable the Uniform Simulta-

---

[21] Capron and Kass, *A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal.* 121 *U. Penn. L. Rev.* 87 (1972).

[22] Michigan, Alaska, Hawaii, Iowa, Louisiana, Texas, West Virginia and Alabama. *See* note 19.

[23] Montana and Tennessee have used this as a model. *See* note 19.

[24] *See* note 19.

neous Death Act[25] since evidence showed that one accident victim survived another, the evidence being testimony by two eye witnesses who felt a faint pulse and saw blood spurting from the cracked skull of one accident victim and felt no pulse and saw no respiration from his wife, the other accident victim. A physician testified to the effect that the described spurting of blood indicated heart beats. Based upon that uncontradicted testimony, this court held that there was direct evidence that the husband had survived his wife.

While then current medical knowledge supported the belief that life persisted as long as the heart beat, present day scientific knowledge requires the conclusion that a person may well be dead notwithstanding the fact that the heart temporarily continues to pump blood throughout the body, or that the lungs are forced by a mechanical respirator to expand and contract as oxygen is intermittently pushed into them.

One of the neurologists testified as follows in the instant case, his testimony not being contradicted:

"The heart is an autonomous organ, and it does not really depend on the integrity of the brain to maintain its function. It's what we call an involuntary muscle, which would continue to beat at its own rhythm. That beating may be influenced in a normal person by the impulses from the brain, but the beating of the heart is not dependent entirely on the impulses that it receives from the brain. So you can have a situation where you may have a complete destruction of the brain or brain functions, and yet the heart will continue to beat."

This was not known at the time of, and was certainly not in evidence in, *Sauers v. Stolz, supra.* To the extent that the opinion negates the concept of brain death, it is overruled.

## VIII.

■ We recognize the authority of, and indeed encourage, the General Assembly to pronounce statutorily the standards by which death is to be determined in Colorado. We do not, however, believe that in the absence of legislative action we are precluded from facing and resolving the legal issue of whether irretrievable loss of brain function can be used as a means of detecting the condition of death. Under the circumstances of this case we are not only entitled to resolve the question, but have a duty to do so. To act otherwise would be to close our eyes to the scientific and medical advances made world wide in the past two or three decades.

As the rule of this case and that to be followed until otherwise changed legislatively or judicially, we adopt the provisions of the proposed Uniform Act. We repeat its provisions:

---

[25] The opinion cited this as chapter 197 S.L. '43. The last statutory compilation in which it appears is C.R.S. 1963 (153-18-1 *et seq.*). The present statute is found at section 15-11-613, C.R.S. 1973.

"For legal and medical purposes, an individual who has sustained irreversible cessation of all functioning of the brain, including the brain stem, is dead. A determination under this section must be made in accordance with reasonable medical standards."

■ Our recognition of this concept of brain death does not preclude continuing recognition of the standard of death as determined by traditional criteria of cessation of respiration and circulation. The effect of our opinion is the same as that of proposed H.B. 1416 introduced in the Colorado General Assembly and referred to earlier here in note 16. That provided for alternate determinations of death, the first being brain death as defined in the Uniform Act and the second being somatic death as traditionally defined.

■ Under the facts in this case the action of the respondent court could be approved by using any of the modern criteria of brain death above set forth.

Confirming our action already taken: Rule discharged *nunc pro tunc* September 25, 1979.