[No. 46582.   En Banc.   October 2, 1980.]

*In the Matter of the Welfare of*
WILLIAM MATTHEW BOWMAN.

408

*James E. Deno* (of *Cogdill, Deno & Millikan*), for appellant.

*Bart Waldman* (of *Perkins, Coie, Stone, Olsen & Williams*), for respondent Children's Orthopedic Hospital.

*Slade Gorton, Attorney General,* and *Bruce P. Clausen, Assistant,* for respondent State.

*A. J. Losee,* for respondent Jane Bowman.

*Steven C. Gilyeart* on behalf of State Medical Association, *Stimson Bullitt* on behalf of State Hospital Association, and *James M. Vache,* amici curiae.

UTTER, C.J.—This is an appeal by the guardian ad litem appointed for William Matthew Bowman (Matthew) prior to Matthew's death, from the decision of the Snohomish County Superior Court ruling that because he had suffered irreversible loss of brain activity, he was in fact dead on October 17, 1979. Issues raised on appeal are: (1) whether law or medicine should define the standards establishing when death occurs; (2) if law is to define those standards, should the brain death standard be adopted; and (3) if that standard is adopted, what role should medicine have in defining the criteria for determining whether the standard has been met. We hold that it is for law to define the standard of death, that the brain death standard should be adopted, and that it is for the medical profession to determine the applicable criteria—in accordance with accepted medical standards—for deciding whether brain death is present. Our action affirms the judgment of the trial court.

Matthew Bowman, age 5, was admitted to Stevens Memorial Hospital on September 30, 1979, after suffering massive physical injuries inflicted by a nonfamily member who was caring for him. The next day the Department of Social and Health Services filed a petition alleging that Matthew was dependent, inasmuch as his parents could not be found. A shelter care order was entered which authorized the Department to transfer him to Children's Orthopedic Hospital and give consent to such medical and surgical care as was deemed necessary by the attending physician. When the natural parents were found, the original order was amended to give the Department and the parents power to authorize routine medical care and all necessary emergency care.

A hearing was held on October 17, 1979, to determine whether the dependency petition should be dismissed because a parent was present and able to care for the child. The guardian ad litem for Matthew, who had been appointed prior to the location of his parents, resisted the dismissal on the ground that the result would be a decision to terminate the life support systems sustaining Matthew.

The trial court denied the motion to dismiss initially and received testimony from the child's attending physician.

That testimony indicated that Matthew had been unconscious since admission to Stevens Hospital, and except for a brief period of increased neurological activity, had gradually weakened. He was being maintained on a ventilator, which enabled him to breathe and provided oxygen to his heart, and various other life support mechanisms. Numerous tests had been performed during his hospitalization to measure Matthew's brain functions.

The physician testified that on the date of the hearing Matthew showed no brain activity. An electroencephalogram (EEG) gave no reading and a radionuclide scan, which shows whether blood is getting to and through the brain, found a total absence of blood flow. No cornea reflex was present and Matthew's pupils were dilated and nonreactive to any stimuli. There were also no deep tendon reflexes or other signs of brain stem action, nor responses to deep pain or signs of spontaneous breathing. Body temperature and drug intake had been controlled to avoid adverse influence on these tests. The testifying physician indicated that he believed Matthew's brain was dead under the most rigid criteria available, called the "Harvard criteria", and that his cardiovascular system would, despite the life support systems, fail in 14 to 60 days. He further testified that all physicians in the Children's Orthopedic Hospital intensive care unit agreed that Matthew was no longer alive by October 17 and recommended that he be removed from the ventilator, a recommendation consented to by his mother. According to the physician, brain death is operative as a definition of death in the state of Washington, and medically accepted criteria exist in the state for determining when brain death occurs. These generally require coma, lack of electrical activity, and lack of blood flow to the brain.

Findings of fact entered by the trial court and supported

by substantial evidence establish the following:

> The prevailing practice of the medical community, both in the State of Washington and nationwide, is to regard "brain death" as the death of the person. The medical profession has established several criteria by which to determine if brain death has occurred, and under the most stringent criteria offered by the medical profession, Matthew has suffered brain death. There is no possibility that Matthew's brain will resume functioning.

The trial judge then held, based on the findings of fact that:

> The legal definition of death in the State of Washington must coincide with the prevailing medical opinion within the State as to when death occurs. Since the prevailing medical opinion recognizes that a person dies when an irreversible loss of brain function occurs, the irreversible cessation of brain activity constitutes death under Washington law.
>
> Under Washington law, William Matthew Bowman is dead. The fact that modern medical technology can keep his heart beating and his blood circulating for a finite period of time after brain death does not make him a living being in the eyes of the law.

Matthew's guardian ad litem, after the testimony, requested the court to enjoin the withdrawal of life support equipment and compel the Department to authorize extraordinary measures. The hospital was also joined as a party. The court enjoined Children's Orthopedic Hospital from terminating or removing the life support systems until October 27, 1979, in order to give the guardian ad litem the opportunity to appeal the trial court's decision to the Supreme Court. The matter was noted for argument on October 24, 1979. Despite the maintenance of the life support systems, all bodily functions of Matthew ceased on October 23, 1979. Although technically moot, the question presented meets all the criteria set forth in *Sorenson v. Bellingham,* 80 Wn.2d 547, 496 P.2d 512 (1972), and the court therefore heard argument in the case.

I

■ Death is both a legal and medical question. Traditionally, the law has regarded the question of at what moment a person died as a question of fact to be determined by expert medical testimony. However, recognizing that the law has independent interests in defining death which may be lost when deference to medicine is complete, courts have established standards which, although based on medical knowledge, define death as a matter of law. *See* Capron & Kass, *A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal,* 121 U. Pa. L. Rev. 87, 92–93 (1972). Thus, the law has adopted standards of death but has turned to physicians for the criteria by which a particular standard is met.

Until recently, the definition of death was both medically and legally a relatively simple matter. When the heart stopped beating and the lungs stopped breathing, the individual was dead according to physicians and according to the law. The traditional definition did not include the criterion of lack of brain activity because no method existed for diagnosing brain death. Moreover, until recently, no mechanical means have been available to maintain heart and lung action; and respiration, heart action, and brain function are so closely related that without artificial support, the cessation of any one of them will bring the other two to a halt within a very few minutes. Wasmuth, *The Concept of Death,* 30 Ohio St. L.J. 32, 38 (1969). Thus, Black's Law Dictionary 488 (4th ed. 1951), based upon older medical technology, defines death as:

> The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc.

With the recent advancement of medical science, the traditional common law "heart and lungs" definition is no longer adequate. Some of the specific factors compelling a more refined definition are: (1) modern medicine's technological ability to sustain life in the absence of spontaneous

heartbeat or respiration, (2) the advent of successful organ transplantation capabilities which creates a demand for viable organs from recently deceased donors, (3) the enormous expenditure of resources potentially wasted if persons in fact dead are being treated medically as though they were alive, and (4) the need for a precise time of death so that persons who have died may be treated appropriately. Lecture by Professor Thomas McCormack on judicial decisions and biomedical ethics, University of Washington School of Medicine (April 30, 1980).

The numerous legal issues which look to the time and presence of death as determining factors require a legal response to these new developments. Inheritance, liability for death claims under an insurance contract, proximate cause and time of death in homicide cases, and termination of life support efforts are but a few of the areas in which legal consequences follow from a determination of whether death has occurred.

Recognizing that the former common law definition of death is no longer universally applicable, respondents maintain that brain death is also death under Washington law such that life supports may be terminated. Appellants, on the other hand, argue that there is an insufficient basis for the law to move away from the traditional "heart and lungs" definition, and to do so, as the trial court did, is tantamount to depriving persons of life.

The specific issue in this case is whether or not Matthew was legally dead on October 17, 1979, when the physicians declared that he had suffered brain death. We are not presented with the much more difficult question of whether life support mechanisms may be terminated while a person is still alive but in that condition known as a "persistent vegetative state," in which some brain functioning continues to exist. We are concerned here only with whether brain death, identified as the irreversible destruction of the entire brain from which cardiorespiratory death inevitably follows, is a recognized standard of death in this state.

## II

With the ability of modern medical techniques to restore the function of vital organs or compensate for their non-function, medical decisions may be made based not on "scientific" fact but on the physician's concept of life and death. The decision by a physician as to whether a person is dead is thus not merely a medical, biological, or physical conclusion. It is, in part, a philosophical decision about what conditions define human life, combined with an empirical determination that those conditions are absent and not latent in a given case. Lecture by Ronald Moore, Associate Professor of Philosophy, University of Washington, at Washington Appellate Judges' Conference (April 30, 1980). The determination involves differentiating between human life and biological life, marking the dividing line between what constitutes human life and that which is purely mechanical.

Aspects of the philosophical problems involved in this issue have been frequently discussed. *See generally* L. Isaacs, *Death, Where is Thy Distinguishing?*, Hastings Center Rep. (February 1978). One of the most thoughtful is found in the June 20, 1980, statement by the Vatican Congregation for the Doctrine of the Faith. In section 4 of that statement, entitled "Due Proportion in Use of Remedies," the Congregation addressed the problem of protecting the moment of death, in terms of both the dignity of the human person and the concept of life, against a technological attitude that threatens to become an abuse. "Some people," they stated, "speak of a 'right to die' which is an expression that does not mean the right to procure death either by one's own hand or by means of someone else, as one pleases, but rather the right to die peacefully with human and Christian dignity. From this point of view, the use of therapeutic means can sometimes pose problems.

"Everyone has the duty to care for his or her own health or to seek such care from others. Those whose task it is to care for the sick must do so conscientiously and administer the remedies that seem necessary or useful.

"However, is it necessary in all circumstances to have recourse to all possible remedies?"

This concern is universal for all of every faith and background. One of the difficult questions discussed in the Vatican statement concerns the question of what means to maintain some bodily functions are proportionate and what are disproportionate.

A clarification of the general principle stated by the Vatican addresses the issue of proportionality and states that it is permissible to make do with normal means that medicine can offer. "Therefore one cannot impose on anyone the obligation to have recourse to a technique which is already in use but which carries a risk or is burdensome. Such a refusal is not the equivalent of suicide; on the contrary, it should be considered as an acceptance of the human condition, or a wish to avoid the application of medical procedures disproportionate to the results that can be expected, or a desire not to impose excessive expense on the family or the community.

"When inevitable death is imminent in spite of the means used, it is permitted in conscience to take the decision to refuse forms of treatment that would only secure a precarious and burdensome prolongation of life, so long as the normal care due to the sick person in similar cases is not interrupted."

These issues are properly addressed by the law, as they require the striking of a balance between competing interests in our society.

> But what interests there are in a society and which of these are, and which should be, the subject of legal recognition are questions partly for sociology, partly for law and partly for ethics; and the reconciliation of conflicts between competing interests is in a broad sense part of the problem of justice.

P. Fitzgerald, *Salmond on Jurisprudence* 64 (12th ed. 1966).

While 20 years ago a victim of cardiac arrest had little chance of survival, now, however, up to one in five victims

returns to productive life. This advance in technology has produced a tragic problem not known before, of those whose cardiorespiratory systems may be kept functioning but whose brains have suffered massive and irreversible damage resulting in brain death.

Society does not require physicians to be experts on the philosophical aspects of these questions, or to define which physiological functions decisively identify a living human organism. Society does turn to physicians, like other scientists, to suggest which "vital signs" have what significance for which human functions. They may, for example, show that a person in an irreversible coma exhibits total unawareness to externally applied stimuli and biological needs and complete unresponsiveness, and they may project that when tests for this condition yield the same results over a 24-hour period, there is only a very minute chance that the coma will be "reversed." However, the judgment that total unawareness and complete unresponsiveness are the equivalent of death addresses questions more related to philosophy and law and is not the exclusive domain of medicine.

The determination by a physician that the symptoms of brain death are present, in accordance with acceptable medical standards, emphasizes that cessation of brain function is a symptom of the loss that makes a person dead, rather than the loss itself. It is the law's determination that brain death is the legal equivalent of death because—under current medical science—the capacity for life is irretrievably lost when the entire brain, including the brain stem, has ceased functioning.

### III

■ To fully understand the precise contentions of both parties, it is necessary to review what occurs to patients who suffer brain damage.[1]

---

[1]The following description relies heavily on R. Cranford & J. McCabe, *Law Recognizes Brain Death*, Uniform Law Memo (Winter 1980). John M. McCabe is legal counsel and legislative director for the National Conference of Commissioners on Uniform State Laws. Ronald E. Cranford is an advisor to that commission

The most frequent causes of brain death are massive head injuries, massive spontaneous brain hemorrhage secondary to complications of hypertension or rupture of a congenital berry aneurysm, and lack of blood pumped into the brain because of cardiac arrest or systemic hypotension. Brain death occurs when the swelling is so severe that the pressure within the cranial cavity exceeds the pressure of blood flowing into the brain and the brain stem, causing cerebral circulation to cease. In this condition, there is no clinical evidence of brain function. Intense stimulation may bring no response or voluntary motor movements, and there are no eye movements at the brain stem level. Spontaneous respiration ceases because the vital respiratory centers of the brain have been destroyed. The patient depends entirely on mechanical support to maintain cardiorespiratory function. Normal cardiac functioning can be achieved, mechanically, even in the presence of total brain destruction, and can continue for as long as an hour after a patient is pronounced dead and the respirator discontinued.

However, mechanical maintenance of heartbeat and circulation can be continued only for a limited period of time when the brain stem has been destroyed. It is this limited survival period that distinguishes between brain death and the persistent vegetative state. In the latter state, irreversible damage occurs to the cerebral cortex, but the brain stem continues to function. Considerations involved in dealing with this condition are entirely different from those involved in brain death and require the drawing of a line between severe dysfunction and no function at all. That is not the case now before this court.

Determination of whether cessation of brain function has occurred may be made in a matter of minutes. The decision as to whether it is irreversible may require several days. Ingestion of suppressant drugs and low body temperature

and is an associate physician in neurology and a director of the neurological intensive care unit at Hennepin County Medical Center, Minnesota.

may cause a reversible loss of brain function, so these possibilities must be screened out before a person is pronounced brain dead.

The medical profession has established criteria by which to measure whether brain death has occurred. In *Lovato v. District Court,* ___ Colo. ___, 601 P.2d 1072 (1979), after extensively discussing the history of modern scientific views on the medical community's definition of death, the Colorado Supreme Court discussed the medical profession's brain death criteria. In 1968, a Harvard Medical School committee developed criteria which now constitute the basis of accepted medical standards for the determination of brain death. Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death, *A Definition of Irreversible Coma,* 205 J.A.M.A. 337 (1968). *See Lovato,* at 1076. These "Harvard criteria" require (1) unreceptivity and unresponsivity to even the most intensely painful stimuli; (2) no spontaneous movements or spontaneous breathing for at least 1 hour; (3) no reflexes, as shown by no ocular movement, no blinking, no swallowing, and fixed and dilated pupils. The report further recommended flat electroencephalograms (EEG's) as a confirmatory test, and that hypothermia and use of central nervous system depressants as causes be eliminated. The Task Force on Death and Dying of the Institute of Society, Ethics, and Life Sciences appraised this report, and concluded that the Harvard criteria were reasonable and appropriate. More recently, refinements in the criteria have been proposed. *See Refinements in Criteria for the Determination of Death: An Appraisal,* 221 J.A.M.A. 48 (1972); *An Appraisal of the Criteria of Cerebral Death: A Summary Statement,* 237 J.A.M.A. 982 (1977). We defer to the medical profession for further refinement of the criteria.

IV

Both courts and legislatures have responded to these medical advances and adopted brain death as a standard of death. At least 25 state legislatures have enacted brain

death statutes.[2] Kansas, the first state to adopt such legislation, established a 2-tier definition of death. Their 1971 act provides that a person is dead where there is an absence of spontaneous respiration and cardiac function and attempts at resuscitation are considered hopeless; or, when there is an absence of spontaneous brain function and it appears that further attempts at resuscitation will not succeed. Kan. Stat. Ann. § 77-202 (Supp. 1979). In 1972, a model statute was proposed by Professor Alexander Morgan Capron of the University of Pennsylvania and Dr. Leon R. Kass. Capron & Kass, *supra*. Adopted by at least eight states,[3] this version differs from the Kansas statute in that it recognizes brain death only when "heart and lungs" death cannot be determined because of the use of artificial life supports.

In 1975, the American Bar Association sought to simplify earlier brain death legislation. It approved a model which is now used by two states,[4] but also asked the Uniform Law Commissioners to refine the proposal. The American Medical Association's Board of Trustees has also approved a model bill. The essential difference between this model and other proposals is that the other proposals include brain stem death, which thus draws a clear legal line between brain death and the persistent vegetative state. R. Cranford & J. McCabe, *supra*.

In other states, brain death has been approved by judicial ruling. In *Commonwealth v. Golston*, 373 Mass. 249, 366 N.E.2d 744 (1977), *cert. denied*, 434 U.S. 1039, 54 L.

---

[2]*E.g.*, Conn. Pub. Act 79-556; Idaho Code § 54-1819 (1979); Kan. Stat. Ann. § 77-202 (Supp. 1979); Wyo. Stat. § 35-19-101 (Supp. 1980).

[3]Ala. Code tit. 22, § 22-31-1 (Supp. 1979); Alaska Stat. § 09.65.120 (Supp. 1979); Haw. Rev. Stat. § 327C-1 (Supp. 1979); Iowa Code Ann. § 702.8 (West 1979); La. Civ. Code Ann. art. 9:111 (West Supp. 1980); Mich. Stat. Ann. § 14.228(2) (1976); Tex. Rev. Civ. Stat. Ann. art. 4447(t) (Vernon Supp. 1980); W. Va. Code § 16-19-1(c) (Supp. 1980).

[4]Mont. Rev. Codes Ann. § 50-22-101 (1979); Tenn. Code Ann. § 53-459 (1977).

Ed. 2d 788, 98 S. Ct. 777 (1978), the Supreme Court of Massachusetts upheld an instruction to the jury in a homicide case that brain death satisfies the element of the crime requiring proof of the victim's death. In reply to the defendant's assertion that the trial judge had improperly changed the law, the court stated that the judge correctly took into account significant technological advances. *Golston,* at 254. In *Lovato,* the court adopted the language then proposed by the National Conference of Commissioners on Uniform State Laws for the Uniform Brain Death Act. That act provided:

> For legal and medical purposes, an individual who has sustained irreversible cessation of all functioning of the brain, including the brain stem, is dead. A determination under this section must be made in accordance with reasonable medical standards.

Uniform Brain Death Act § 1, 12 U.L.A. (Supp. 1980).

As was the case in Colorado and Massachusetts, no statute in this state has been enacted to define what constitutes death as posed by the facts now before us. It is both appropriate and proper, therefore, that this court decide that question. The definition adopted in *Lovato* does not clarify how the concept of brain death is interrelated with the more traditional definition of death as the cessation of respiration and circulation. A revised act was submitted to the National Conference of Commissioners on Uniform State Laws on July 26, 1980. That act, approved and recommended for enactment in all states, harmonizes the two concepts, clarifying possible ambiguity previously existing.

Adoption of this standard will alleviate concern among medical practitioners that legal liability might be imposed when life support systems are withdrawn, even though the brain is irreversibly dead and circulation and respiration will inevitably cease. It will also permit discontinuation of artificial means of life support in a manner where even those most morally and emotionally committed to the preservation of life will not be offended. We do not address

what are acceptable diagnostic tests and medical proce-
dures for determining when brain death has occurred. It is
left to the medical profession to define the acceptable prac-
tices, taking into account new knowledge of brain function
and new diagnostic procedures.

We therefore adopt the provisions of the Uniform Deter-
mination of Death Act which state:

> An individual who has sustained either (1) irreversible
> cessation of circulatory and respiratory functions, or (2)
> irreversible cessation of all functions of the entire brain,
> including the brain stem, is dead. A determination of
> death must be made in accordance with accepted medical
> standards.

Uniform Determination of Death Act (August 7, 1980 rec-
ommendation). This standard reflects both the former
common law standard and the evolutionary change in med-
ical technology.

The action of the trial court is affirmed.

STAFFORD, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS,
and WILLIAMS, JJ., and HAMILTON, J. Pro Tem., concur.

ROSELLINI, J. (dissenting in part)—I would hold that an
individual who has sustained irreversible cessation of all
functioning of the brain, including the brain stem, is dead.
A determination must be made in accordance with reason-
able medical standards.