Gary L. SWAFFORD, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 1080S387.

Supreme Court of Indiana.

May 28, 1981.

Rehearing Denied Aug. 18, 1981.

Lawrence J. Brodeur, Monroe County Public Defender, Bloomington, for appellant.

Linley E. Pearson, Atty. Gen., George B. Huff, Jr., Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Gary L. Swafford, was convicted of murder by a jury. Ind.Code § 35–42–1–1(1) (Burns 1979 Repl.). He was sentenced to the Indiana Department of Corrections for a period of thirty-two years. He presents the following issues for our review:

1. Whether the evidence was sufficient to support the verdict of the jury;

2. Whether the trial court erred in instructing the jury on "brain death";

3. Whether the trial court erred in refusing to instruct the jury on the lesser offenses of battery and criminal recklessness;

4. Whether the trial court erred in instructing the jury on the defense of insanity; and

5. Whether the trial court erred in admitting defendant's confession.

The record reveals that on the evening of September 8, 1979, defendant and the decedent, William Robinson, met at the Omni Tavern in Bloomington, Indiana. After consuming a few drinks together at the Omni, the two men went to Robinson's apartment. There, Robinson made several homosexual advances toward the defendant, who eventually became angry, produced a handgun, and shot Robinson in the back of the head.

Robinson, who remained conscious, summoned an ambulance and was taken to Bloomington Hospital. There, an examination revealed that the bullet had penetrated the right cerebellum and was located near the center of the brain, close by the brain stem. Based on the nature of the wound and location of the bullet, doctors determined that Robinson should be taken to Methodist Hospital in Indianapolis, where expert neurosurgical care and facilities were available.

Neurological surgeons at Methodist Hospital, concerned over the extremely close proximity of the bullet to Robinson's brain stem, elected to defer an operation to extricate the bullet pending any deterioration of Robinson's condition. During the evening hours of September 9, Robinson's condition took a dramatic turn for the worse; his heartbeat and respiration stopped, his pupils fixed and dilated, and he turned blue.

Resuscitative efforts of the Methodist Hospital emergency team, including the use of mechanical support systems, resulted in the restoration of Robinson's heartbeat and respiration. Neurosurgeons then opened the skull in an attempt to relieve pressure building on the brain, which had caused the stoppage of respiration and heartbeat. Following the operation, it was necessary to place Robinson on a mechanical ventilator, which supplies oxygen to the heart, in order to sustain his heartbeat and respiration.

The following day, neurosurgeons made a preliminary diagnosis that Robinson's brain had died. He no longer responded to painful external stimuli, such as pinching, and his spontaneous movements had ceased. On September 10 and 11, two studies of blood flow within Robinson's brain were conducted and revealed no arterial flow of blood to the brain. Based on the blood flow studies, the lack of spontaneous movement, the nonresponsiveness to external stimuli, and the examination of the brain, neurosurgeons concluded that Robinson had suffered an irreversible cessation of all brain functions.

After consulting with family members, neurological surgeon Dr. Julius Goodman formally declared Robinson dead at approximately 7:00 p. m. on September 11, 1979. The immediate cause of death listed on the certificate of death was "brain death"; the cause thereof was attributed to the gunshot wound.

At the time Robinson was formally declared dead and the certificate issued, his heartbeat and respiration—sustained by the mechanical ventilator—continued. There is no evidence in the record regarding the

withdrawal of the mechanical support system or the termination of decedent Robinson's heartbeat and respiration. The record does reveal, however, that an autopsy was conducted on Robinson's body on September 12.

## I and II.

Defendant's contention that the evidence was insufficient to support the verdict of the jury rests on the supposition that "death" is legally defined as the cessation of heartbeat and respiration. Defendant has also challenged the trial court's instruction [1] to the jury that "brain death" satisfies the element of murder requiring proof of the death of the victim. The questions are correlative, and we consolidate them for purposes of our discussion.

We observe at the outset that our research, as well as that of the parties involved, reveals that Indiana has never adopted a legal definition of "death," either by statute or judicial decree. Defendant maintains, however, that the definition of death contained in the Fourth Edition of Black's Law Dictionary controls our disposition. He argues that the application of any other definition would constitute the retroactive application of a new statutory construction, and so violate the due process principles enunciated in *Bouie v. City of Columbia*, (1964) 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894.

We disagree. Black's definition of death reads:

"The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." Black's Law Dictionary p. 488 (4th ed. 1968).

No source is credited for the definition. *Id.* If it had derived from common law or statutes of England made prior to the fourth year of the reign of James the First (1607), defendant's position would warrant consideration; those laws have by statute been incorporated into the body of law which governs this state. Ind.Code § 1–1–2–1 (Burns 1972).

As it is, we encounter a definitional void. The fact that "death" has not been legally defined in Indiana merely reflects the fact that, until recent medical history, no reason existed for the traditional medical definition of death detailed in Black's Fourth Edition to engender legal controversy. Only in the last two decades has the state of medical science and technology evolved to the point where a patient's heartbeat and respiration may be mechanically sustained, even though the patient has suffered an irreversible loss of all brain functions.

In tandem with the development of the mechanical capacity to sustain heartbeat and respiration, the concept of "brain death" has gained virtually universal acceptance in the medical profession.[2] Brain

1. The instruction reads:
"If you find beyond a reasonable doubt that William Robinson had suffered brain death before he was removed from the respirator, then the state has satisfied the essential element of the crime of murder requiring proof beyond a reasonable doubt of the death of the victim. Brain death occurs when, in the opinion of a licensed physician, based on accepted medical standards, there has been a total and irreversible cessation of spontaneous brain functions and further attempts at resuscitation or continued supportive maintenance would not be successful in restoring such functions."

2. Uncontroverted testimony at trial established that brain death was a medically accepted standard for determining death. In addition, see Podgers, J., *Brain Death Concept Gaining Ac-*

ceptance 66 A.B.A.J. 272 (1980); Horan, D., *Definition of Death: An Emerging Consensus* 16 Trial 22–66 (Dec.1980); Victor, *Brain Death: An Overview* 27 Med.Trial Tech.Q. 55–58 (1980); Black, *Brain Death, Part I*, 299 N.Eng.J. Med. 338 (1978); Black, *Brain Death, Part II*, 299 N.Eng.J.Med. 393 (1978); National Institute of Neurological and Communicative Disorders and Stroke, *An Appraisal of the Criteria of Cerebral Death: A Summary Statement* 237 J.A.M.A. 982 (1977); Hoffman and Van Cura, *Death—The Five Brain Criteria*, Med.Trial Tech.Q. 377 (1978); Cantor, *Quinlan, Privacy, and the Handling of Incompetent Dying Patients*, 30 Rutgers L.Rev. 243 (1977); Collestar, Jr., *Death, Dying and the Law: A Prosecutorial View of the Quinlan Case*, 30 Rutgers L.Rev. 304 (1977); Conway, *Medical and Legal Views of Death: Confrontation and Reconciliation*, 19 St. Louis U.L.J. 172 (1974). The medico-legal

death generally describes permanent cessation of all brain functions; unless sustained by mechanical support, cessation of somatic functions follows invariably from this condition, for one function of the brain and its stem is the control of vital activities such as heartbeat and respiration. 237 J.A.M.A. 982 (1977).

This evolution in medicine has spawned concomitant developments in law. *See, e. g., In the Matter of Quinlan,* (1976) 70 N.J. 10, 355 A.2d 647, *cert. den.* 429 U.S. 922, 97 S.Ct. 319.[3] Twenty-eight states, either by statute[4] or judicial fiat,[5] have adopted "brain death" definitions to supplement the traditional medical standards by which death is determined. And, significantly, months prior to the shooting which precipitated this action, the Fifth Edition of Black's Law Dictionary—bearing for the first time in that tome's history a definition of "brain death"—was published. Black's Law Dictionary p. 170 (5th ed. 1979) reads, in pertinent part, as follows:

"Characteristics of brain death consist of: (1) unreceptivity and unresponsiveness to externally applied stimuli and internal needs; (2) no spontaneous movements or breathing; (3) no reflex activity; and (4) a flat electroencephalograph reading after 24 hour period of observation. *Com. v. Golston,* Mass., 366 N.E.2d 744. An increasing number of states have adopted this so-called 'Harvard' definition of brain death, either by statute or court decision."

Black's recognition of brain death prior to the events which precipitated this action counters defendant's argument that our disposition is controlled by the traditional definition of death recognized in the Fourth Edition.

The question whether and when death has occurred in any particular instance bears significant and extensive legal ramifications. Questions of inheritance, criminal and civil proximate cause, liability under life insurance contracts, the termination of mechanical support systems, and the con-

commentators are not unanimous, however, for the topic engenders philosophical as well as medical debate. *Compare* Houts, *Brain Death: The Issues are not Settled Yet,* 22 Trauma 1–7 (1980) and Veatch, *Defining Death: The Role of Brain Function* 22 Trauma 8–9 (1980).

**3.** In the much publicized case of Karen Quinlan, the Supreme Court of New Jersey ruled that Quinlan's father be granted his request to be appointed guardian of his comatose daughter so that he might exercise on her behalf the constitutional right of privacy to be allowed to die. Based on her father's petition, the conclusion of physicians that "no reasonable possibility" existed that Karen would ever attain a "cognitive, sapient state," and the approval of the Hospital Ethics Board, mechanical life support was withdrawn.

Quinlan sustained an irreversible coma which, as the medical community now recognizes, is distinct from brain death. Irreversible coma describes a permanent comatose or vegetative state where all functions of the cerebrum cease, but somatic functions continue. Brain death, on the other hand, includes the destruction of all portions of the brain, including respiratory control centers, and so results inevitably in the cessation of spontaneous somatic functions such as respiration and heartbeat. The former condition is not recognized as tantamount to death by the medical community. National Institute of Neurological and Communicative Disorders and Stroke, *An Appraisal of* the Criteria of Cerebral Death: A Summary Statement 237 J.A.M.A. 982 (1977); *Lovato v. District Court In & For Tenth Jud.,* (1979) Colo., 601 P.2d 1072 n. 6.

We consequently emphasize that we are not here concerned with the question whether and when artificial life support should be withdrawn from a person in a permanently vegetative state.

**4.** Ala.Act 165, 1979; Alaska Stat. § 09.65.120; Ark.Stat.Ann. § 82–537; Cal.Health & Safety Code § 7180; Conn.Pub.Act 79–556 (1979); Ga. Code § 88–1715.1; Haw.Rev.Stat. § 327C–1; Idaho Code § 54–1819; Ill.Rev.Stat. ch. 110–½, § 302; Iowa Code § 702.8; Kan.Stat. § 77–202; La.Civ.Code Ann. art. 9:111; Md.Ann.Code art. 43, § 54F; Mich.Comp.Laws § 326.8b; Mont. Rev. Codes Ann. § 50–22–101; Nev.Stats. ch. 162 (1979); N.M.Stat.Ann. § 12–2–4 (1978); N.C.Gen.Stat. § 90–322; Okl.Stat. tit. 63 § 1– 301; Or.Rev.Stat. § 146.087; Tenn.Code Ann. § 53–459; Tex.Rev.Civ.Stat.Ann. § 4447t (Vernon Supp.1980); Va.Code § 54–325.7; W.Va. Code § 16–19–1; Wyo.Stat. § 35–19–101.

**5.** *Lovato v. District Court In & For Tenth Jud.,* (1979) Colo., 601 P.2d 1072; *Com. v. Golston,* (1977) 373 Mass. 249, 366 N.E.2d 744, *cert. den.* 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788; *In re Welfare of Bowman,* (1980) 94 Wash.2d 407, 617 P.2d 731.

comitant exposure of physicians to medical malpractice claims are but a few of the areas in which the determination of death is of crucial import.

In the context in which the issue is raised and decided here—the law of homicide—the question has particular significance apart from proximate cause considerations. The medical community's capacity to sustain heartbeat and respiration through artificial means juxtaposes uncomfortably with the long-standing common law rule that criminal liability for homicide does not attach unless the death of the victim occurs within a year and a day of the injury. *State v. Carrier*, (1956) 235 Ind. 456, 134 N.E.2d 688; *Alderson v. State*, (1924) 196 Ind. 22, 145 N.E. 572. Originally prompted by the inexactitude which characterized the medical community's ability to determine cause of death, the rule has recently been abolished by several jurisdictions as antiquated under contemporary medical science. *See, e. g. State v. Young*, (1977) 148 N.J.Super. 405, 372 A.2d 1117; *Commonwealth v. Ladd*, (1960) 402 Pa. 164, 166 A.2d 501.

Like those jurisdictions, it has never been the policy of the courts of this state to close our eyes to change or disregard reality. *See, e. g., Brooks v. Robinson*, (1972) 259 Ind. 16, 284 N.E.2d 794 (doctrine of interspousal immunity abolished as based on outmoded legal theories); *Troue v. Marker*, (1969) 253 Ind. 284, 252 N.E.2d 800 (prohibition of wife's recovery for loss of consortium abrogated on basis of changes in legal and social status of women); *Perkins v. State*, (1969) 252 Ind. 549, 251 N.E.2d 30 (sovereign immunity abolished in face of changing role of government and development of insurance). In *Perkins* this Court stated:

"[T]he common law of today is not a frozen mold of ancient ideas, but such law is active and dynamic and thus changes with the times and growth of society to meet its needs." 252 Ind. at 554, 251 N.E.2d at 33.

Here, defendant concedes that recognition of "brain death" is a general consensus of the medical community, but argues that this Court should defer to the legislature to determine whether it should be recognized in law. Defendant's contention that the issue is purely a legislative matter rests on the claim that "the medical profession is far from unanimous as to the most reliable criteria for the determination of brain death"; consequently, legislative study and discussion should precede legal recognition of brain death, he argues.

Defendant's argument begs the question. Our sole concern here is whether, for purposes of the law of homicide, the irreversible cessation of total brain functions should be recognized as a standard by which death may be determined. If so, the manner and means by which an assessment of brain condition should be made would remain a purely medical question. The law would require only that, as with all medical practice, the methods employed conform to medically accepted standards. *Brook v. St. John's Hickey Memorial Hospital*, (1978) 269 Ind. 270, 380 N.E.2d 72.

We do note that we find little of the disagreement alluded to by defendant with respect to the criteria by which the medical community presently determines brain death. The basic clinical criteria were first established in 1968 by the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death.[5a] Those criteria are: (1) a total lack of responsivity to externally applied stimuli (e. g., pinching) and inner need; (2) no spontaneous muscular movements or respiration; and (3) no reflexes, as measured by a fixed, dilated pupil and lack of ocular, pharyngeal, and muscle-tendon reflexes. In addition, the Harvard Committee emphasized that a flat or isoelectric electroencephalogram reading would have great confirmatory value to the

---

**5a.** The *original* work in this field, which preceded the Harvard Committee's study and on which the Harvard work was based, was Halley and Harvey, *Medical vs. Legal Definitions of Death*, 204 J.A.M.A. 103 (1968).

The Halley and Harvey work was refined in *On An Interdisciplinary Solution To The Legal-Medical Definitional Dilemma In Death*, 2 Indiana Legal Forum 219 (1969).

above tests, that two applications of the above tests be conducted twenty-four hours apart, and that hypothermia or the use of central nervous system depressants be excluded as causative factors. Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death: *A Definition of Irreversible Coma* 205 J.A.M.A. 337 (1968); Victor, *Brain Death: An Overview* 27 Med.Trial Tech.Q. 37, 56–58 (1980).

Numerous subsequent studies have both confirmed the validity of the Harvard criteria and suggested refinements in its application. Ad Hoc Committee of the American Electroencephalographic Society on EEG Criteria for Determination of Cerebral Death, *Cerebral Death and the Electroencephalogram*, 209 J.A.M.A. 1505 (1969); Task Force on Death and Dying of the Institute of Society, Ethics, and the Life Sciences; *Refinements in Criteria for the Determination of Death: An Appraisal* 221 J.A.M.A. 48 (1972); National Institute of Neurological and Communicative Disorders and Stroke, *An Appraisal of the Criteria of Cerebral Death: A Summary Statement* 237 J.A.M.A. 982 (1977). See also, Victor, *Brain Death: An Overview*, Appendix 3 ("Guidelines and Procedures for Organ Donation and Transplantation," the Association of Illinois Transplant Surgeons) and Appendix 5 ("Criteria for the Determination of Brain Death as Adopted by the Minnesota Medical Association") 27 Med. Trial Tech.Q. 55–58 (1980). Generally, the refinements which have evolved from these studies have been a de-emphasis on the role of the electroencephalogram, an emphasis on the absence of cephalic (spinal) reflexes rather than muscular-tendon reflexes, and a reduction in the time interval between application of the clinical criteria. In addition, the use of angiography to test cerebral blood flow has been widely recognized as an alternative confirmatory test to electroencephalographic analysis. A collaborative study conducted of 503 comatose patients lacking spontaneous respiration yielded the conclusion that satisfaction of the Harvard criteria, together with a confirmatory test, leaves only an "infinitesimal" chance of patient recovery. 237 J.A.M.A., *supra*, at 985.

Here, the medical experts who testified at trial defined brain death in terms of the basic clinical criteria laid down by the Harvard Committee. Those criteria were applied by neurological surgeon Dr. Julius Goodman, who also conducted two confirmatory blood flow studies prior to his decision to declare Robinson's death.

Continued research and study of brain death will perhaps yield further refinements and increasingly more sophisticated techniques to aid in its determination. The twenty-five states and various advisory bodies which have adopted brain death definitions have recognized that any continuing evolution in the science of determining brain death is a purely medical concern to remain unencumbered by law; not one of those states or advisory bodies has attempted to direct the manner and means by which the determination should be made. *See, e. g., Calif. Health & Safety Code* § 7180 (1976); *Com. v. Golston,* (1977) 373 Mass. 249, 366 N.E.2d 744, *cert. den.* 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788; ABA, *Report of the Committee of Medicine and Law,* 11 Forum 300, 303 (1975); National Conference of Commissioners on Uniform State Laws, *Uniform Brain Death Act* § 1, 12 U.L.A. (Supp.1980).

The determination of what condition constitutes death, however, can no longer be regarded exclusively as a medical question. As we have already explained, the presence and time of death is determinative of various questions presented in the law. We recognize the authority of the legislature to define by statute—and for all legal purposes—the standards by which death is to be determined in Indiana. Indeed, in the face of advancing medical technology, we encourage them to so act, as have the legislatures of twenty-five other states.

■ Here, as was the case with our brethren in Massachusetts, Colorado, and Washington, we have no statute to guide us in the resolution of the question put to us. *Com. v. Golston, supra; Lovato v. District In & For Tenth Jud.,* (1979) Colo., 601 P.2d

1072; *In re Welfare of Bowman*, (1980) 94 Wash.2d 407, 617 P.2d 731. Like those jurisdictions, we are unable to ignore the advances made in medical science and technology during the last two decades. Among the members of today's medical community the irreversible cessation of total brain functions is commonly accepted as tantamount to death as traditionally defined, for it is acknowledged as fact that only through artificial means will heartbeat and respiration continue thereafter.[6] On that basis, we hold that for purposes of the law of homicide proof of the death of the victim may be established by proof of the irreversible cessation of the victim's total brain functions. The trial court did not err in so instructing the jury.

■ Lest any confusion result, we recognize the following definition of death for purposes of the law of homicide: An individual who has sustained either (1) *irreversible cessation of circulatory and respiratory functions,* or (2) *irreversible cessation of total brain functions,* is dead. *A determination of death must be made in accordance with accepted medical standards. Compare,* ABA, *Report of the Committee of Medicine and Law,* 11 Forum 300, 303 (1975); *In re Welfare of Bowman, supra,* adopting definition of National Conference of Commissioners on Uniform State Laws, *Uniform Determination of Death Act* (August 7, 1980 recommendation). This definition embraces both the traditional standard of death and the recent developments in medical science and technology.

■ We also find that the evidence was sufficient to support the jury's conclusion that the decedent Robinson had sustained an irreversible cessation of his total brain functions. Medical testimony at trial established that the bullet was lodged within a centimeter of the brain stem. Internal bleeding caused intense pressure to build within the cranial cavity; notwithstanding

an operation to relieve the pressure, spontaneous cardiorespiratory functions ceased. Heartbeat and respirations were sustained by artificial means while blood flow studies of the brain were conducted. The results of the studies indicated a total lack of arterial blood flow in any part of the brain or its stem; in other words, the brain tissue had died for lack of blood and oxygen. This conclusion confirmed the preliminary diagnosis of brain death which had been made on the basis of the Harvard criteria.

These are the classic circumstances from which brain death occurs. The fatal cessation of cerebral circulation results when the pressure inside the cranial cavity exceeds the pressure of blood flowing into the brain and its stem. *In re Welfare of Bowman, supra,* citing Crawford, R., and McCabe, J., *Law Recognizes Brain Death,* Uniform Law Memo (Winter, 1980). Based on these circumstances, as well as his examination of the brain, neurosurgeon Dr. Goodman certified that Robinson's total brain functions had ceased. The evidence was sufficient to support the verdict of the jury. *State v. Fierro,* (1979) 124 Ariz. 182, 603 P.2d 74; *Com. v. Golston, supra.*

■ Finally, we note that it is the rule of homicide law that a defendant is responsible for the death of the decedent if the injuries inflicted contribute either mediately or immediately to the death. *Bivins v. State,* (1970) 254 Ind. 184, 258 N.E.2d 644; *Reed v. State,* (1979) Ind.App., 387 N.E.2d 82. Although no evidence was introduced concerning the operation or withdrawal of the mechanical ventilator, the evidence of the autopsy and the determination therefrom that the cause of death was the gunshot wound would have been sufficient to sustain the jury's verdict under the traditional medical standard of death. *State v. Fierro, supra; Com. v. Golston, supra.*

---

**6.** That the condition is tantamount to death as traditionally defined squares with the conclusion of the Court in *Com. v. Golston, supra,* that legal recognition of brain death merely constitutes an "evolutionary restatement" of the traditional definition of death. 373 Mass. at 254, 366 N.E.2d at 749. The condition has always existed; what has prompted legal recognition of brain death is the ability of the medical profession to now determine with exactitude its presence.

## III.

■ Defendant maintains that the trial court erred when it refused to instruct the jury on the lesser offenses of criminal recklessness, Ind.Code § 35–42–2–2 (Burns 1979 Repl.), and battery, Ind.Code § 35–42–2–1 (Burns 1979 Repl.). In support of his contention, he relies on *Roddy v. State*, (1979) Ind.App., 394 N.E.2d 1098, wherein the Court of Appeals synthesized Indiana case law on the law of lesser included offenses and outlined a methodology for the determination of when an instruction on a lesser offense was appropriate. *Id.* at 1103.

Relying primarily on *Lawrence v. State*, (1978) 268 Ind. 330, 375 N.E.2d 208, the court in *Roddy* explained that the resolution of the question whether an instruction should be given on a lesser offense involves a two-step inquiry. The first step is designed to determine whether the lesser offense is "included" within the crime charged. That determination is made by examining the elements which compose the greater and lesser offenses, together with the factual allegations contained in the charging instrument. If it is determined that the lesser offense is "included" within the greater crime charged, step two is triggered. It is designed to determine if the evidence warrants an instruction on the lesser and included offense. Generally, that determination hinges on whether a serious evidentiary dispute exists with respect to the element which distinguishes the greater and lesser offense. *Id.*

Here, there is no question that the lesser offenses of criminal recklessness and battery were "included" within the greater crime of murder, as it was alleged to have been committed in the charging instrument. The state alleged therein that defendant murdered Robinson by "shooting at or against the body of said William Robinson with a certain gun loaded with gun powder and bullets." These allegations state the elements of criminal recklessness and battery as defined by statute. *See* Ind.Code § 35–42–2–2, *supra*, and § 35–42–2–1, *supra*. Consequently, within the facts charged here, the two offenses were "included."

*Lawrence v. State, supra; Roddy v. State, supra.*

The element which distinguishes murder from the lesser included offenses of battery and criminal recklessness is the degree of harm, death, to the victim. Defendant's contention that instructions on the two included offenses should have been given rests on his assertion, heretofore rejected, that there is no direct evidence that William Robinson "died."

Suffice it to say that the evidence reveals an autopsy was conducted on Robinson's body three days after the shooting. Whether measured by brain death or traditional standards, there is nothing to support even an inference that Robinson did not die. The evidence regarding the commission of the element which distinguishes the greater offense from the lesser included offenses was undisputed. The trial court properly refused to instruct the jury on battery and criminal recklessness. *Lawrence v. State, supra; Roddy v. State, supra.*

## IV.

■ Defendant also objects to the instructions which the trial court gave on insanity, as well as its refusal to give the instructions which he tendered concerning that defense. He maintains that the court's instructions to the jury, which stated that the burden of proving insanity was on the defendant, violated the due process guarantees of the United States and Indiana Constitutions.

The trial court's instructions accurately stated existing Indiana law. Ind.Code § 35–41–4–1(b) (Burns 1979 Repl.). This Court has recently rejected defendant's contention. *Emory v. State*, 420 N.E.2d 883 (1981) citing *Jacks v. State*, (1979) Ind., 394 N.E.2d 166, and *Price v. State*, (1980) Ind., 412 N.E.2d 783; *Thomas v. State*, 420 N.E.2d 1216 (1981), *citing Leland v. Oregon*, (1952) 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, and *Price v. State, supra*. The trial court did not err.

## V.

Defendant contends that the trial court erred when the state was permitted to introduce into evidence his confession to the murder of decedent Robinson. Defendant's contention is grounded upon the *corpus delicti* requirement to the admission of confessions; specifically, defendant asserts that the record reveals no evidence independent of the confession to establish that the gunshot wound was the product of a criminal act, rather than an accidental or suicidal one.

 In order for a defendant's confession to be admissible, the state must introduce independent evidence to establish the *corpus delicti,* or fact that the specific crime charged has actually been committed by someone. *Ross v. State,* (1978) 268 Ind. 471, 376 N.E.2d 1117; *Cambron v. State,* (1975) 262 Ind. 660, 322 N.E.2d 712. The state is not required to prove the *corpus delicti* beyond a reasonable doubt, and the requirement may be satisfied by circumstantial evidence. *Cambron v. State, supra.*

Here, the defendant's sister, Pat Ringo, testified that defendant had told her that he had shot a man in the neck and that the man had deserved it. For the purpose of determining the admissibility of defendant's confession, this evidence was sufficient to establish that the fatal injury suffered by Robinson was the product of a criminal act. *Cambron v. State, supra.* The trial court did not err in overruling defendant's objection to the introduction of the confession.

For all the foregoing reasons, there was no trial court error and the judgment of the trial court should be affirmed.

Judgment affirmed.

GIVAN, C. J., and PRENTICE and PIVARNIK, JJ., concur.

DeBRULER, J., concurs in result.