THE STATE OF OHIO, APPELLEE, *v.* CLARK, APPELLANT.

(No. 84AP-356—Decided October 11, 1984.)

*Michael Miller,* prosecuting attorney, and *Alan C. Travis,* for appellee.

*Tyack, Delligatti & Briscoe* and *Janet A. Grubb,* for appellant Todd W. Clark.

McCORMAC, P.J. Todd W. Clark, defendant-appellant, asserts that the trial court erred in overruling his motion for dismissal on the basis of double jeopardy.

Defendant was involved in a one-car automobile crash on August 2, 1983. A passenger in the vehicle which defendant was driving was critically injured and taken to the hospital where he was placed on artificial life supports until August 16, 1983, at which time he was declared dead.

Defendant was charged with operating a motor vehicle while under the influence of alcohol and failure to control his vehicle on August 2, 1983, the date of the accident. On August 5, 1983, defendant appeared in Franklin County Municipal Court and entered no contest pleas to both charges. At that time, the judge of the Franklin County Municipal Court inquired of defense counsel about Mark Bateman, the passenger who was declared dead on August 16, 1983, and defense counsel stated simply that he "was still in the hospital." The municipal court judge found defendant guilty of both misdemeanors and sentenced him accordingly.

On November 9, 1983, defendant

was indicted by the Franklin County Grand Jury for aggravated vehicular homicide in violation of R.C. 2903.06, for recklessly causing the death of Mark S. Bateman while operating a motor vehicle.

Defendant moved to dismiss the charge on the ground of double jeopardy, which motion was overruled by the trial court after an evidentiary hearing.

Dr. David Yashon, a neurosurgeon, testified that Mark Bateman came under his medical care in the emergency room on August 2, 1983 while suffering a severe head injury from the automobile accident. He said that they did a cat scan and found that surgical treatment was not indicated. Dr. Yashon stated that Bateman was in extremely poor condition and that they gave him all the support they could to keep him alive and to hopefully improve his condition. Dr. Yashon stated that Bateman's condition, on August 2, 1983, was nearly hopeless but that he was not declared to be officially brain dead until August 16, 1983, when he died while still on the life support systems. The hospital records pertaining to Bateman from St. Anthony Hospital were introduced into evidence. There was a note in Dr. Yashon's handwriting on August 4, 1983 indicating that Bateman was "brain dead." Dr. Yashon explained that Bateman clinically showed essentially all of the signs of being brain dead, but that he was not legally brain dead because that required two EEG tests twenty-four hours apart which were flat, and that those were not performed until August 15 and 16, 1983. Dr. Yashon said that, on August 5, 1983, he noted that Bateman was clinically brain dead but that he could not be pronounced dead because he was on pentobarbital, which is a depressant. He explained that an EEG was not done before August 15, because he had "seen some miracles happen. I was hoping it would happen to this boy. So I wanted to keep him alive for awhile longer and so I didn't run the EEG. It was my choice." Dr. Yashon stated that the purpose of pentobarbital is to put the brain to sleep, an experimental method of treating severe head injuries, and that, while on that drug, EEG tests would not be reliable. Dr. Yashon stated that Bateman was essentially brain dead from a clinical standpoint from the time of his arrival at the hospital and that he never improved. He said that, for determining legal brain death, physicians in Ohio generally use the Harvard standards which require two flat EEG tests within a twenty-four-hour period. Dr. Yashon said that he probably did not inform any law enforcement agency or the police that Bateman was brain dead. In conclusion, Dr. Yashon stated that the date of Bateman's death was August 16, 1983, when he was officially declared brain dead.

The arresting officer stated that he investigated the accident and checked on the condition of the passenger; that he was told that the passenger was in the hospital in critical condition; and that he was never informed that Bateman was brain dead, but only that he was critically injured.

The father of the deceased passenger testified that Dr. Yashon advised him that his son was brain dead on the night of the accident, but that he was on life support systems. Dr. Yashon advised him that there was hope, although the damage was very severe to his son's skull and neck; and that since he was young, there was a possibility that if they administered the drug which supposedly rested the brain, a miracle might happen, "like one in a thousand."

Dr. Tate, a pathologist for the Franklin County Coroner, testified that he performed an autopsy on Mark Bateman on August 16, 1983. It was his opinion from examination of the brain that Bateman was brain dead at the time of his initial admission to the hospital

emergency room on August 2, 1983, and that he would have died on that date except for the artificial support system that kept him breathing by artificial means.

The trial court found as a fact that Bateman was not legally dead until the EEG tests were performed, accepting Dr. Yashon's opinion that the legal date of death was August 16, 1983, rather than Dr. Tate's analysis which he stated was based upon the benefit of hindsight.

Double jeopardy does not apply where the state is unable to proceed with one of the charges at the time of the first trial because additional facts necessary to sustain the later charge had not occurred or had not been discovered despite the exercise of due diligence at the time of the disposition of the initial charges. *State* v. *Thomas* (1980), 61 Ohio St. 2d 254 [15 O.O.3d 262].

The state was unable to proceed with a charge of aggravated vehicular homicide until Mark Bateman, the passenger in the vehicle, was legally dead. The trial court found that, legally, he was not dead until pronounced dead by his attending physician on August 16, 1983.

In *State* v. *Long* (1983), 7 Ohio App. 3d 248, defendant was involved in an automobile accident on December 3, 1981, in which a person was taken to the hospital with massive head injuries and other trauma and placed on a mechanical life support system. The investigating law enforcement official was informed that the hospital staff did not expect the person to survive. Four days later, the injured person was removed from the life support system and pronounced dead. In the meantime, on December 4, 1981, one day after the accident, defendant entered guilty pleas to the traffic charges and was found guilty. In *Long*, we held that death did not occur until December 7, 1981, when the victim was pronounced dead.

This case is remarkably similar to *Long*. While there was more evidence here as to the victim being essentially brain dead upon arrival at the hospital, it was still a reputable physician's opinion that legal death did not occur until after disposition was made in municipal court of the misdemeanor charges. Moreover, in *Long,* the police were notified that the victim was not expected to survive. In this case, the police were notified only that the passenger was in critical condition. In addition, the municipal court, before entering a determination of guilt in the misdemeanor cases, was only informed that Bateman was in the hospital. Even if Bateman were held to have been legally dead at the time the judgments were entered in municipal court, the rejection of the double jeopardy defense would be justified on the basis that the facts necessary to sustain the aggravated vehicular homicide charge, that is the death of the passenger, had not been discovered on August 5 despite the exercise of due diligence. Furthermore, there have been significant advances in medical science concerning treatment of the critically injured patient. Conditions thought to be hopeless only a few years ago now result in recovery. While R.C. 2108.30 recognizes so called "brain death," there is a requirement that the determination be made in accordance with accepted medical standards by a physician by observing and conducting a test to determine that the irreversible cessation of all functions of the brain has occurred. R.C. 2108.30 appears to have been adopted to provide immunity for good faith determinations and to help implement the effectiveness of the Uniform Anatomical Gift Act.

In any event, it is clear that determination of the exact time of death is an area where there is significant disagreement within the medical community and one that does not remain static because of the development of new methods of

treatment, such as the drug that was administered to the brain in this case to give some slight hope of recovery. The attending physician cannot remove the brain to examine it in order to make his determination of life or death; hence, his determination for the purposes of double jeopardy application was properly held to be more legally significant than the determination of the pathologist based upon an examination of the organs during the autopsy.

Finally, regardless of technical arguments concerning the time of the brain death of a victim who is still breathing through use of artificial life supports, it would appear impracticable to attempt to convict the defendant of manslaughter or murder until the victim is legally declared dead and removed from the life supports.

Defendant's assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

NORRIS and STILLMAN, JJ., concur.

STILLMAN, J., retired, of the Eighth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.